(45 Misc. Rep. 64)

### FAULKNER v. CODY et al.

(Supreme Court, Special Term, Oneida County. September, 1904.)

1. DEED—WHEN A MORTGAGE.
> Where a deed, though absolute in form, is in fact a mortgage, the relation existing between the parties is that of mortgagor and mortgagee.

2. SAME—FORECLOSURE—EJECTMENT.
> Where it is shown that a deed, though absolute in form, was intended by the parties to be a mortgage, it remains a mortgage until the equity of redemption is foreclosed, and no action of ejectment will lie by the mortgagee against the mortgagor until after foreclosure.

3. SAME—RIGHT TO REDEEM.
> Whatever stipulations may have been made by the parties at the time a deed absolute in form, but intended as a mortgage, was made, the right of redemption after default remains in the grantor, and will be enforced in equity.

4. SAME—PURCHASE OF EQUITY.
> A contract for the purchase by the grantee in a deed absolute in form, but in fact a mortgage, of the equity of redemption, will not be sustained unless it is in all respects fair, and for an adequate consideration.

5. SAME—EVIDENCE.
> Evidence considered, and *held* that a deed absolute in form was in fact intended by the parties as a mortgage.

6. MORTGAGE—SUIT TO REDEEM—FRAUD.
> In an action by the grantor in an absolute deed, but in fact a mortgage, to redeem, a defense that the deed was made for the purpose of delaying the plaintiff's creditors will not be sustained unless the evidence establishes such intent, as such purpose cannot be presumed.

Action by John J. Faulkner against Francis A. Cody and others to redeem from the lien of a mortgage. Judgment for plaintiff.

Michael J. Powers, for plaintiff.
Matteson & De Angelis, for defendants.

ROGERS, J. Action to redeem from lien of mortgages held by the defendant Francis A. Cody.

From 1861 down to March, 1897, the plaintiff was in possession, and exercising dominion, as owner, of 53 acres of land, situate in the town of Vernon, Oneida county, N. Y. This parcel had been contracted by the state to one Van Swall, and the contract assigned to the plaintiff. On the 25th day of March, 1888, $500 remained unpaid on the contract. This amount the plaintiff borrowed of one James H. Ransom, paid up the contract, and procured from the state a patent, dated that day, running to Ransom, pursuant to a parol agreement that the same should

¶ 4. See Mortgages, vol. 35, Cent. Dig. §§ 808, 809.

be held by him as security for the loan.　Plaintiff was also owner in fee of two other parcels of land situated in the same town—one of 1.69 acres, and the other 6.38 acres.　These he mortgaged to Ransom March 13, 1879, to secure the payment of $400 April 1, 1885, with interest thereon annually.　The complaint alleges that it was agreed by said Ransom that "whenever plaintiff should pay the amount of money so borrowed, and the interest thereon, he * * * would give plaintiff a deed of said premises, and satisfy said mortgage."　The evidence justifies the finding that the deed was taken as security for the $500, but does not clearly establish the allegation as to a cancellation of the $400 mortgage　On the 24th of February, 1872, one Tryphena Dunlap conveyed to the plaintiff by warranty deed 121.60 acres of land situate in said town, and, as I understand, adjacent to said Ransom parcel, subject to a mortgage of $5,000 on this and other lands, $3,000 of which the plaintiff assumed.　March 23, 1877, the plaintiff sold 58.19 acres of this purchase to George Geary, leaving 63.41 acres.　There was default in this mortgage, and the same was foreclosed; the foreclosure sale of the 63.41 acres taking place April 2, 1889.　The plaintiff was then owing one Niles L. Tilden $300, and procured him to bid in this parcel, evidently for $1,800, as Mr. Burke, the lawyer, who advised in the matter, testifies that the advance was $1,800 or $1,900. Eighteen hundred dollars and the $300 make $2,100, the consideration recited in the deed.　It was orally agreed, while going to attend the sale, that title should be taken by Tilden, and held as security for the debt and the amount so advanced.　The plaintiff continued to occupy this land, also, cultivating, improving, and carrying it on in connection with said Ransom lot as one farm, down to said March, 1897, and in the meantime making payments of interest, with a considerable amount of principal.　The Ransom and Tilden deeds, though absolute in form, were mortgages upon the respective parcels.　The relation of the parties was that of mortgagor and mortgagee.　This is familiar doctrine, recognized and asserted in many cases.　Newcomb v. Bonham, 1 Vern. 7; Odell v. Montross, 68 N. Y. 499; Kraemer v. Adelsberger, 122 N. Y. 476, 25 N. E. 859; Cooley v. Lobdell, 153 N. Y. 600, 47 N. E. 783; Mooney v. Byrne, 163 N. Y. 86, 57 N. E. 163; Reich v. Dyer, 91 App. Div. 240, 86 N. Y. Supp. 544.　"The fact once established, either by the terms of the conveyance or by other evidence, that the grant was intended as a mortgage, the rights of the parties are measured by the rules of law applicable to mortgagors and mortgagees; and the conveyance remains but a mortgage until the equity of redemption is foreclosed, and the mortgagee cannot have ejectment against the mortgagor, or those claiming under him, until after foreclosure." Carr v. Carr, 52 N. Y. 251; Horn v. Keteltas, 46 N. Y. 605; Murray v. Walker, 31 N. Y. 399; Clark v. Henry, 2 Cow. 324.　So the maxim is, "Once a mortgage, always a mortgage."　3 Pom. Eq. Juris. § 1193. "If the instrument is in its essence a mortgage, the parties cannot by any stipulations, however express and positive, render it anything but a mortgage, or deprive it of the essential attributes belonging to a mortgage in equity.　The debtor or mortgagor cannot, in the inception of the instrument, as a part of or collateral to its execution, in any manner deprive himself of his equitable right to come in after a default in pay-

ing the money at the stipulated time, and to pay the debt and interest, and thereby redeem the land from the lien and incumbrance of the mortgage. The equitable right of redemption, after a default is preserved, remains in full force, and will be protected and enforced by a court of equity, no matter what stipulations the parties may have made in the original transaction purporting to cut off this right." Mooney v. Byrne, supra.

But I am pressed to find, notwithstanding the deeds and the agreements pursuant to which they were taken might have been mortgages, that by subsequent transactions they were divested of that character, and the grantees became absolute owners. A paper purporting to be a lease of the Tilden lot, dated April 1, 1891, from Tilden to plaintiff, for one year, at a yearly rental of $300, is produced, and the contention is that thereby Tilden became landlord, and Faulkner tenant. It will be remembered that the plaintiff did not enter or occupy under the lease. He was already in possession as owner. There is no evidence that he paid Tilden anything as rent, nor that he did anything other than sign the paper, recognizing a superior right. While a tenant is estopped from disputing the title of his landlord, I do not understand that in a case where several instruments between the same parties, and pertaining to the same property, exist, but differing in their terms, and, when standing alone, in legal effect, the real truth may not be ascertained and declared. What the purpose of this lease was, does not appear from the evidence, though it may be conjectured. The instrument contains a chattel mortgage clause, and was filed in the office of the town clerk, indicating an intention to give Tilden additional security for his debt. It is not probable that the plaintiff would have made payments upon the original indebtedness, so that in January, 1897, the amount had been reduced to $1,000, as will hereafter appear, if he had been divested of all interest, except as tenant, to property presumably worth the amount bid at the foreclosure sale. A somewhat similar claim is made as to the Ransom piece. This was conveyed to the wife, Lucia C., December 29, 1896, the consideration expressed being $1. Whether she took title without knowledge of all the circumstances connected with the conveyance by the state to her husband does not appear, nor is it important, as the plaintiff was in the actual possession of the land, which was notice to her of his rights. An instrument is also produced, made by James H. Ransom and the plaintiff, dated April 12, 1889, reciting that Ransom is owner, by which Ransom agrees to pay the plaintiff $708 at the date of the instrument, in consideration of which the plaintiff agrees to work the 53 acres for one year, and to lease to Ransom the 8 acres of land known as the Royal Jacobs lot, to employ all necessary help, board hop pickers, furnish all the tools and horses necessary for operating the farm, and deliver the product to market. This, too, was filed with the town clerk. The instrument is an unusual one. What it really meant, or why it was made, is not apparent. Clearly, it was not a lease of the 53 acres, which would create an estoppel, nor was it a conveyance by the plaintiff to Ransom, nor did it purport in any manner to change the relation of mortgagor and mortgagee, theretofore existing. An agreement to show such change could only be found upon clear and convincing evidence. As between mortgagor and

mortgagee, a contract for the purchase by the latter "of the right of redemption is looked upon with jealousy by courts of equity, and will be sustained only when in all respects fair and for an adequate consideration." Odell v. Montross, 68 N. Y. 499.

Certain chattel mortgages from the plaintiff to Tilden and Ransom are produced. So far as I can understand them, they only tend to show an indebtedness from him to them, quite consistent with the continuance of the relation of debtor and creditor having security.

It is further urged that these instruments were made for the purpose of hindering and delaying the plaintiff's creditors; that the plaintiff was an active participant in the fraud, and is therefore without remedy. Fraud must be proved, not presumed. Shultz v. Hoagland, 85 N. Y. 469. I do not think the evidence establishes a fraudulent intent, and am unwilling to find that fact; but, if so, how can the defendant avail himself either of this or the alleged estoppel? The plaintiff is an old man, having had his full share of the troubles that come from domestic discord and financial embarrassments. The defendant Francis A. Cody is his nephew and evidently a man in easy circumstances, with ample means at command. The plaintiff alleges and testifies that in November, 1896, he entered into an agréement, in substance, by which Cody was to take deeds from Tilden and Mrs. Ransom, and carry the indebtedness for him until he should be able to arrange for payment, and that at a convenient time thereafter the contract so made should be reduced to writing. The plaintiff's housekeeper, Mrs. Skellum, gives testimony tending to corroborate him. All this Cody emphatically denies, and he produces witnesses who testify to certain declarations alleged to have been made by the plaintiff, which are said to aid his contention. The plaintiff's conduct at the time was not in accord with the supposed declarations, and I think the witnesses must have misunderstood or misinterpreted them. They do not convince me. The defendant goes so far as to state that no talk whatever was had with the plaintiff regarding his own purpose or the plaintiff's rights until after he had procured the deeds of the property to himself—one January 7, and the other January 23, 1897. He testifies that he bought in good faith, notwithstanding from boyhood he had been a frequent visitor at the plaintiff's house, knowing all the time that he was in possession of the farm, making permanent improvements thereon, and conducting the same as though he were owner. The defendant now asserts that the plaintiff has no interest therein, and that by virtue of the deeds he has become the absolute owner. Either situation places him in an unfavorable light. One is a broken promise; the other, an uninvited and unwarranted interference with the rights of his less fortunate kinsman. I am constrained to find as a fact that he made the agreement substantially as testified. This conclusion is reached not only from the testimony of the plaintiff and his one witness, with whom I am not too favorably impressed, but because of various circumstances. It is not probable that Cody would have made the purchase without a special examination of the land, buildings, fences, etc., which the plaintiff says he did make in November or December. Nor would a right-minded man voluntarily step in and become a party to a transaction that might unjustly oppress another laboring under the stress of burdensome-

financial obligations. Tilden and Ransom had held the deeds as security for a considerable time. They were old, and desired to close up their matters with him. Their prudence in this regard is shown by the fact that both Tilden and Mrs. Ransom have since died, and that Mr. Ransom has become physically and mentally incapacitated. The property was worth at least $5,400—much more than the amounts unpaid on the Tilden and Ransom debts. The consideration recited in each deed exceeded by a substantial sum the amount actually paid by the defendant. This departure from the truth could hardly be attributed to accident, as each deed was drawn by a different scrivener, and at a different time and place. The fact that Cody expressly agreed to, and did, purchase this property for the plaintiff's benefit years after the lease and peculiar agreement mentioned precludes him from now urging they were vicious, as an excuse for not performing. This action is not embarrassed by an answer alleging want of equitable jurisdiction (Lough v. Outerbridge, 143 N. Y. 271, 38 N. E. 292, 25 L. R. A. 674, 42 Am. St. Rep. 712), or the statute of frauds (Matthews v. Matthews, 154 N. Y. 288, 48 N. E. 531). This omission was, no doubt, well advised. Ryan v. Dox, 34 N. Y. 319, 90 Am. Dec. 696; Kincaid v. Kincaid, 85 Hun, 141, 32 N. Y. Supp. 476; Greenly v. Shelmidine, 83 App. Div. 559, 82 N. Y. Supp. 176.

It follows that the plaintiff is entitled to some relief. What and how much? The plaintiff testifies that he made payments of principal and interest to Tilden, so that at the time of making the arrangement the debt had been reduced to $1,000. Cody testifies that he paid that amount, and produces his canceled promissory note to Tilden, dated January 7, 1897, indicating that the sum mentioned was the amount paid. The evidence regarding the amount due on the Ransom indebtedness is not so satisfactory. Mr. Brown testifies the amount of the advance, at the time of taking the deed from the state was arranged for, was $500. The complaint alleges that the plaintiff "had nearly, if not quite, paid said Ransom in full for all the amounts which plaintiff had borrowed from said Ransom." Notwithstanding this, he testifies that in his conversation with Cody he stated, in substance, the amount to be paid Ransom was $500. This also is the testimony of Mrs. Skellum. But in the complaint he also alleges that he was to pay Cody such sum as he (Cody) paid to Ransom. Without amendment, a fact in his favor cannot be found, contrary to his allegations. Cody testifies that the payment was $1,600, and produces a note for that amount, purporting to bear indorsement of payments, receipted for by Mrs. Ransom.

For the purpose of this case, I think it must be assumed that the Ransom indebtedness, including the $400 mortgage, amounted in all to $1,600. How it became so much is not apparent, nor is it clear what apportionment of the $1,600 was made to the mortgage on the 8.07 acres, and how much to the deed from the state. The mortgage was for $400 and interest, and on the foreclosure of it by Cody it is stated that on the 31st of March, 1897, there was due the sum of $400 principal, and $71.60 of interest. This deducted from the $1,600 would make the amount applicable to the 53 acres $1,128.40. To redeem, then, the plaintiff should pay the defendant $2,128.48, with interest on $1,000 from January 7, and on $1,128.40 from January 23, 1897, to which

should be added—following the complaint—"a reasonable sum for his services and trouble in the matter." How much, the evidence does not disclose. The amount will be ascertained by a referee appointed for that purpose.

In March, 1897—whether the 10th or the 18th, does not distinctly appear—Cody, with several other men, went to the house on the premises in question, where plaintiff was then residing, forced open the door, took down his stove, put out his furniture, and put a man named Burke in possession of the farm. This was done against the plaintiff's protest, and without legal process or semblance of right. So much is practically admitted by the defendant. After denying that he himself took part in moving out the plaintiff's goods, he was asked whether he directed it to be done and answered: "You might call it that way. I told Mr. Burke he was in possession." When further questioned whether he directed the removing of the stove, he says: "I might. It was moved out, anyway, in the other part of the house. Possibly I did. * * * I told him to move it out." On the same occasion, one Miller, Cody's brother-in-law, seized plaintiff's personal property, pursuant to an old, assigned chattel mortgage, and subsequently sold the same, realizing about $1,200. Cody denies that he was instrumental in procuring this to be done, or that he acted in concert with Miller. The coincidence, however, is suggestive. Since then the defendant has continued in possession of the property, either in person or by tenant, to the entire exclusion of the plaintiff. The value of the use and occupation from that time should be credited on the mortgage indebtedness. Witnesses differ as to what the fair rental value of the property was. Those on the part of the defendant placing it at from $150 to $175 and $240 per year. The defendant's witness Rodemore concedes that the house alone was worth from $1,500 to $2,000, and the barns and hophouse more than $500. Mr. Coe, plaintiff's witness, places the rent at $500, "over and above taxes." After making due allowance for the honest partisanship of witnesses, and considering the quality of the soil, and the productiveness and location of the farm, it seems to me that a conservative figure would be at least $350.

It appears that Cody, since he took possession, has made valuable, permanent improvements on the farm, part of which is the rebuilding of the barns and putting up a new one, at an expense of $2,000, and he asks to have the amount thus expended charged to the plaintiff. As I understand, a "mortgagee in possession" is one who enters either by the consent of the mortgagor, honest mistake, or pursuant to lawful process, and that even in such case he is not to be allowed for permanent improvements, but only for necessary reparations made by him during the time. Moore v. Cable, 1 Johns. Ch. 385; Madison Ave. Bap. Ch. v. Oliver St. Bap. Ch., 73 N. Y. 82; 3 Pom. Eq. Juris. § 1217. Here, however, Cody obtained possession without a semblance of right. There was an absence of good faith. He was a mere naked trespasser, and is not entitled to the protection given to a mortgagee lawfully there. Though his expenditures may have benefited the property, whatever he did was as a wrongdoer, and he is not entitled to be compensated therefor. "To hold that one who has merely a lien, and but an equitable right, can get a legal one by the commission of a trespass,

would be neither logical nor just." Per Finch, J., Howell v. Leavitt, 95 N. Y. 617, 621.

As already intimated, it is not proven that Cody agreed to satisfy the mortgage on the 8.07 acres. He took an assignment from Ransom, and subsequently foreclosed. The foreclosure seems to have been regular, and, for aught I see, is binding upon the plaintiff, and should not now be disturbed.

The plaintiff will have an interlocutory judgment, permitting a redemption, and directing the defendant Francis A. Cody (in which his wife, the defendant Mary E. Cody, will join) to execute and deliver to him a deed of the premises in question, which deed shall contain covenants of warranty against his own acts. On the coming in and confirmation of the referee's report, fixing the amount that should be allowed for services in making the advance and taking the deeds from Tilden and Ransom, application may be made for final judgment. The question of costs may be presented at that time. Belden v. Slade, 26 Hun, 635; Cross v. Smith, 85 Hun, 49, 32 N. Y. Supp. 671; Naylor v. Colville, 20 App. Div. 581, 47 N. Y. Supp. 267.

Judgment accordingly.