The Chase National Bank of the City of New York and Another, as Executors and Trustees under the Last Will and Testament of Philip Gurian, Deceased, Appellants, Respondents, v. Leo Tover, Respondent, Appellant, Impleaded with Bertha Tover, Appellant.

First Department, December 13, 1935.

*David Steckler* of counsel [*Edmund B. Hennefeld* with him on the brief; *David Steckler*, attorney], for the plaintiffs.

*Jay Leo Rothschild* of counsel [*Walter S. Beck* with him on the brief; *Brodsky & Stone*, attorneys], for the defendants.

O'MALLEY, J.  The chief question presented concerns the first cause of action.  In this the plaintiffs sought to recover the sum of $5,000, an alleged loan made to the defendant Leo Tover by Philip Gurian, their testator, in 1926.  A house and lot, title to which was in defendant Bertha Tover, the wife of the defendant Leo Tover, conveyed to the testator at the time, was, according to the plaintiffs, to be held as collateral.

The defense to this cause of action was predicated on the claim that the transaction between the parties constituted a sale of the property to the testator for the purchase price of $5,000, the amount of the alleged loan. The issue thus presented was resolved in favor of the defendant and the first cause of action accordingly dismissed. The plaintiffs urge that the finding on this issue was against the weight of the evidence.

By deed dated October 18, 1926, the defendant Bertha Tover conveyed by a full warranty deed the property located at 1233 Forty-seventh street, in the borough of Brooklyn, to the testator. A separate written agreement between the defendant Leo Tover and the testator was executed simultaneously. This instrument, under seal, was like the deed dated October 18, 1926. In so far as material it provided:

" This agreement made the 18th day of October, 1926, between Philip Gurian, * * * hereinafter known as the party of the first part, and Leo Tover, * * * hereinafter known as the party of the second part.

" Witnesseth: — Whereas the party of the first part is the owner of the premises * * *

" Whereas the party of the second part is desirous of occupying the premises above described,

" Now, therefore,

" (1) The party of the first [part] agrees to allow the party of the second part to have full use and peaceful enjoyment of the above described premises upon the following conditions.

" (2) That the party of the second part will make and pay for all repairs necessary to keep the premises in as good condition as he received the same on the date of this contract.

" (3) That the party of the second part will pay all taxes, assessments and arrears on the above described premises up to the expiration of this agreement.

" (4) That the party of the second part will pay all interest and principal as they become due on all mortgages of record against said premises at the time of the execution of this agreement.

" (5) That the party of the second part will pay to the party of the first part the sum of $300 per year payable in semi-annual installments of $150 on the 18th day of April and October of each year.

" (6) That the party of the second part will pay all premiums on insurance policies to protect the interests of the party of the first part as to Fire and Liability insurance.

" (7) That the party of the second part agrees to and with the party of the first part that upon default in payments in any of the above mentioned clauses, the party of the first part will have at his

election the right to pay the same and to hold the party of the second part liable or to take possession of the premises provided said encumbrances because of default in payments, are not removed within sixty days after they become due.

" (8) The Party of the second part agrees that if he vacate the premises at any time before its sale, then he shall continue to make payments and carry out the conditions above mentioned with the same force and effect as if he were enjoying the full use and occupation of the premises.

" (9) In consideration of the faithful performance of the conditions above mentioned, and other good and valuable consideration paid by the party of the second part to the party of the first part, the party of the first part agrees that upon the sale of the above described premises for $13,000.00 or more, the party of the first part will pay to the party of the second part, one-half of the selling price over and above $13,000.00 provided, however, that the said party of the second part does not encumber the premises to an amount over and above $13,000.00. Should the premises at the time of sale be encumbered to an amount over and above $13,000.00, said amount is to be deducted from that sum which will be due the party of the second part on the sale of the premises.

" (10) Party of the second part agrees that party of the first part shall have exclusive right to sell the premises for any amount which the party of the first part may see fit.

" (11) The party of the first part agrees to and with the party of the second part that in the event that the principal sums due on the mortgages now of record are reduced by the party of the second part then the party of the first part upon the sale of the premises for $13,600 or more will pay to the party of the second part the difference between the principal due on the mortgages on the day of the execution of this agreement and the day of the sale of the above described premises.

" (12) It is further clearly understood and agreed by and between parties hereto that there is no agreement either oral or written contrary to the state of facts as herein above set forth.

" (13) The stipulations aforesaid are to bind the heirs, executors, administrators and assigns of the respective parties.

" Witness the signatures and seals of the above parties."

A deed absolute on its face may always be shown in law or in equity to be a mortgage. (*Kraemer* v. *Adelsberger*, 122 N. Y. 467; *Barry* v. *Hamburg-Bremen Fire Ins. Co.*, 110 id. 1; *Shattuck* v. *Bascom*, 105 id. 39; *Murray* v. *Walker*, 31 id. 399; 1 Wiltsie Mortgage Foreclosure [4th ed.], §§ 6 *et seq.*) Recourse may be had not only to the deed and the agreement of even date, but also to oral testimony

bearing on the intent of the parties, and to a consideration of the surrounding circumstances and the acts of the parties. (1 Wiltsie, *supra.*)

Oral testimony that the transaction was in fact a loan and pledge rather than an outright sale was given by several witnesses. One Gruber, the son-in-law of the testator, testified that he was present when the testator went to Tover's home early in October, 1926. Tover stated that he was having business troubles; that his creditors were pressing him, claiming that a financial statement issued by Tover was not what it should have been, although, so far as Tover knew, it was all right. Several days later the testator told Tover that he would advance him $5,000 which amount would be raised by a loan on the testator's insurance policies. When Tover said he had no security for the loan outside of the house, the testator said that he would take that as security.

Tover himself conceded that he was in financial difficulties at this time and that this transaction, no matter what its character, was for the purpose of helping him out of his difficulty. Blum, Tover's accountant, testified that when preparing income tax reports Tover informed him that he still owned the house and that the payments he had been making were by way of interest. One Adelman, an attorney who formed Tom-Boy, Inc., a corporation hereafter referred to, testified that the testator in Tover's presence stated he had made a loan of $5,000 on the security of the property.

The evidence further discloses that the testator borrowed on his insurance policies to an amount in excess of $5,000, which excess was further used to start both parties in a new business venture.

On October 18, 1926, the testator gave a check in the sum of $1,725.50. This was used to pay off a third mortgage on the property due that day. The deed given on even date recited a consideration of $5,000 and the property was conveyed subject to mortgages aggregating $7,600. While the deed ran from Tover's wife, the premises had originally been in Tover's name. Thereafter, there was advanced on behalf of Tover further sums which in all aggregated a few dollars short of the $5,000.

Pursuant to the arrangement made the testator and Tover went into business in a corporation known as Tom-Boy, Inc. The testator contributed $5,000, Tover contributing nothing at the outset, at least, by way of cash, but was entitled to share equally in the profits. Tover was to make his capital contribution out of his share of future profits until he had contributed a sum equal to that advanced by the testator.

We are of opinion that the agreement of October 18, 1926, on its face affords strong evidence that a loan and a pledge was intended

and not an outright sale. The following facts tend to support such conclusions:

The defendant Tover was permitted to remain in possession. (*Kraemer* v. *Adelsberger, supra; Farmers & Merchants' Bank* v. *Smith*, 61 App. Div. 315, 318, 321.) He was to pay for all necessary repairs; to pay all taxes, assessments and arrears until the expiration of the agreement; to pay all interest and *principal* on mortgages of record (*Kraemer* v. *Adelsberger, supra*); to pay all premiums on insurance policies; to protect the " interests " of the testator; and in addition, to pay the testator the sum of $300 per year in semi-annual installments. It is to be noted that this payment of $300 would be at the rate of six per cent mortgage interest on the sum of $5,000.

The agreement further provided that upon Tover's default, the testator would have the right to pay any defaulted payment " or to take possession of the premises;" and if Tover vacated the premises at any time before their sale, he was to continue to make the payments and carry out the conditions already mentioned with the same force and effect as if he were enjoying full use and occupation.

Tover testifies on his examination before trial that he understood the agreement gave him the right to repurchase the property. Such a right is indicative of a loan. (*Lipe* v. *Beech-Nut Packing Co., Inc.*, 243 App. Div. 433; *Melenky* v. *Melen*, 206 id. 46.) He had the right also to further incumber the property. It would be a most unusual tenancy and sale which would give this right to one other than the owner of the property, and would impose, as already noted, an obligation on the tenant to pay off mortgages. The agreement, moreover, did not provide for any apportionment of interest, etc., as is usual when a sale is made.

All the obligations and rights under the agreement were those which ordinarily would obtain under the relationship of mortgagor and mortgagee.

The evidence is strongly to the effect that $5,000 was in excess of the equity in the property. The testator already owned a house on the same block. No real reason was shown why he should desire another, particularly when he had to borrow on his insurance policies to procure the money.

Tover, concededly in desperate financial circumstances, and though maintaining that the transaction was an outright sale, yet still obligated himself under the agreement not only to bear the same burden already resting upon him, but, in addition thereto, undertook the additional obligation of paying the further sum of $300 per annum. This, it seems to us, very strongly negatives an outright sale.

The acts of the parties after the conveyance tend to support the theory of a loan and pledge and not an absolute conveyance. Tover paid taxes and mortgage interest from 1925 to 1932; he also paid for repairs, strong evidence of a loan. (*Melenky* v. *Melen*, 206 App. Div. 46, 50; *Luessen* v. *Morich*, 72 id. 443.) He continued to occupy the premises until after the testator's death. In 1928 he paid a title company's charge for an extension of the first mortgage.

The second mortgage of $2,200 became due March 21, 1929. Tover, though bound so to do by the terms of the agreement, did not pay off this mortgage with his own funds. It was paid by the testator. However, Tover paid Gurian interest on the $2,200 advanced, evidence that Tover recognized his obligation so to do under the agreement and that he was in fact the owner. In income tax return Tover characterized the $300 per year payment under the agreement as interest. He further deducted taxes on the premises. On the question of credibility there was evidence tending to impeach Tover which need not be here detailed.

The evidence already detailed is in our opinion far more cogent than that relied upon by Tover to show a sale. Chiefly he relied upon the following:

(1) The deed which is absolute on its face. As already stated, this is not controlling; both at law and in equity a deed may be shown to have been given by way of security and not as an outright transfer of title.

(2) The recital in the agreement which described the testator as " owner." This, of course, is but a recital and is only in conformity with the straight deed or conveyance.

(3) The fact that the testator carried this property as a real estate investment upon his books and did not carry it as a loan receivable. This is offset by the fact as already detailed that Tover himself charged off the $300 annual payment as interest and also deducted the amount of the taxes in making up his income tax reports.

(4) The fact that the mortgage extension agreement recited that the testator was the owner. This, of course, was necessary since the *legal title of record* was in the testator. As already pointed out the title company's charge was paid by Tover.

(5) Tover contended that after the business venture with the testator had started, he was well able to repay the loan of $5,000. But there is some doubt as to such ability, since most of his withdrawals from the company went to make up his capital contribution.

Furthermore, while contending that he was well able to pay the $5,000 amount, had it been a proper obligation, it is to be noted that Tover did not pay the $2,200 obligation represented by the second mortgage, which sum was advanced by the testator and on which sum Tover, thereafter, paid interest.

Under these circumstances, therefore, we are of opinion that on the record presented the verdict in favor of Tover in the first cause of action was against the weight of the evidence and that plaintiffs were entitled to a recovery.

On the second cause of action plaintiffs recovered the sum of $2,793.38 owing by Tover under the agreement in suit. The amount is not in dispute. Only a question of law is raised and this we decide in favor of the plaintiffs. Tover contended that his obligations under the agreement ceased upon his vacating the property. We construe the agreement otherwise.

The refusal to allow costs to the defendant Bertha Tover was proper. She joined with her husband in a single answer appearing by the same attorney. Costs were properly disallowed her under the provisions of section 1476 of the Civil Practice Act.

It follows, therefore, that the judgment appealed from, so far as it dismissed plaintiffs' first cause of action, should be reversed and judgment directed in their favor as prayed for, and that otherwise the judgment should be affirmed, with costs to the plaintiffs.

MARTIN, P. J., McAVOY, TOWNLEY and GLENNON, JJ., concur.

Judgment appealed from, so far as it dismissed plaintiffs' first cause of action, reversed and judgment directed in their favor as prayed for, and in other respects judgment affirmed, with costs to the plaintiffs.